**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **JTH TAX LLC d/b/a LIBERTY TAX SERVICE,** ) <br> ) <br> **Plaintiff,** ) <br> ) <br> **vs.** ) <br> ) <br> **NATALIE GRABOWSKI, SUPERNAT** ) <br> **LLC d/b/a LIBERTY TAX FRANCHISE** ) <br> **DAVID M. ROCCI, and ROCK TAX** ) <br> **TEAM,** ) <br> ) <br> **Defendants.** ) <br> -------------------------------------------------- <br> **DAVID M. ROCCI,** ) <br> ) <br> **Counterclaim Plaintiff,** ) <br> ) <br> **vs.** ) <br> ) <br> **JTH TAX LLC d/b/a LIBERTY TAX,** ) <br> **SERVICE,** ) <br> ) <br> **Counterclaim Defendant.** ) | **Case No. 19 C 8123** |

**<u>MEMORANDUM OPINION AND ORDER</u>**

MATTHEW F. KENNELLY, District Judge:

The plaintiff, JTH Tax LLC doing business as Liberty Tax Service, filed suit against the defendants asserting claims for violation of the Defend Trade Secrets Act (Count 4); common law unfair competition (Count 5); and breach of covenants not to compete and solicit (Count 6). Defendant David M. Rocci has filed a counterclaim alleging breach of contract (Count 1).

Liberty moves for summary judgment on Count 1 of Rocci's counterclaim. Rocci

and Rock Tax Team (together, Rocci) move for summary judgment on Count 1 of the counterclaim and for summary judgment on Counts 4–6 of Liberty's amended complaint.

## Background

Because summary judgment is only "appropriate when the admissible evidence shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law," except where otherwise noted, the facts in this section are not in dispute. *See Barnes v. City of Centralia*, 943 F.3d 826, 830 (7th Cir. 2019) (internal quotation marks omitted).

**A.      Count 1 of Rocci's counterclaim**

Rocci and Liberty entered into an "Area Development Agreement." *See generally* dkt. no. 54–1 at ECF p. 1 of 20. Under the agreement, Rocci—as the "area developer"—was given the exclusive right to sell tax preparation franchises in a portion of Massachusetts. In exchange for his services, Liberty paid him 50 percent of royalties derived from his franchisees. The parties' agreement became effective in January 2008 and lasted for a term of ten years. The agreement contained both in-term and post-term covenants to not compete.

Paragraph 4.1 of the agreement states the "[m]inimum [r]equirements" for Rocci. *See id.* at ECF p. 6 of 20. That provision required Rocci to provide Liberty "with a minimum number of Candidates each year that open Franchise Territories." *Id.* According to Schedule B of the agreement, by April 2015, Rocci needed to have identified and secured 17 total franchisees in his area. By April 2016, he had to have secured 19 total franchisees. And by April 2017, Rocci was supposed to have secured 20 total franchisees in his area. Rocci failed to meet the minimum requirements in each

of these years.

Near the end of the term of the agreement, Rocci began considering renewal. Paragraph 8.2 of the agreement, which governed renewal, stated that if Rocci was "in compliance with the terms and conditions in this Agreement," Liberty would "provide [him] with the right to enter into a new agreement . . . for the provision of services to Liberty similar to those in [the current] Agreement." *Id.* at ECF page 9 of 20. The paragraph further explained that should Rocci want to renew, he "must notify Liberty in writing at least 180 days before the expiration of th[e] Agreement." *Id.*

In May 2017, Rocci mailed a letter, addressed to "Liberty Tax Service," by certified mail and with a return receipt requested. He also faxed that same letter on the same date. The letter stated that pursuant to paragraph 8.2., Rocci was submitting notice of his intention to renew the agreement. Despite his notice, Rocci never received any direct correspondence or response to his notice, and the agreement expired by its terms in January 2018. Rocci claims (and Liberty disputes) that Liberty's failure to renew constitutes a breach of contract.

**B.     Counts 4–6 of Liberty's amended complaint**

In addition to the area development agreement, Liberty and Rocci were parties to other agreements relevant to their motions. One set of agreements governed the operation of three retail tax-preparation offices in Bolingbrook, Shorewood, and Plainfield, Illinois. Before December 2016, Rocci operated these offices. The franchise agreements that governed Rocci's rights to the respective offices were identical and contained both in-term covenants not to compete and post-term covenants not to compete.

3

In November 2016, Rocci (along with Rock Tax Team) and Nicole Grabowski entered into a purchase and sale agreement. Under the agreement, Rocci sold to Grabowski the Illinois-based franchises and the right to operate them. After the sale closed in December 2016, Grabowski signed franchise agreements for the three locations; Rocci and Rock Tax Team were not parties to these agreements.

In January 2018, Grabowski abandoned the businesses and relocated to Indiana. As a result, Rocci stepped in to operate the Plainfield office on Grabowski's behalf. Liberty alleges (and Rocci disputes) that during the 2018 tax season, Rocci filed tax returns outside of Liberty's system utilizing an electronic filing identification number (EFIN) associated with Rocci and Rock Tax Team, in violation of the post-term non-compete covenant in Rocci's franchise agreements.

The post-term non-compete covenant expired in December 2018. In January 2019, the Plainfield office reopened under the name Rock Tax Team. (The Shorewood and Bolingbrook offices were closed by this point.) Liberty says even under the Rock Tax Team name, Rocci continued to use Liberty's name, trademarks, and confidential material in the Plainfield office. Specifically, Liberty says it has provided evidence that Rocci continued to use the name Liberty in his web address, displayed Liberty's logo in the Plainfield office's window, used Liberty's customer list, and had contact with former Liberty customers even after termination of the franchise relationship.

Rocci admits that he failed to remove Liberty's name from his web address but says this was inadvertent and denies that he used Liberty's name in any other context. He also denies that he misappropriated Liberty's trademarks or used its confidential materials after the franchise relationship ended.

4

Liberty accuses Rocci of recruiting former employees who worked for the Liberty franchises to work at Rock Tax Team. To support this claim, Liberty has submitted evidence that establishes that two employees who were working for the Liberty franchises when they were transferred to Grabowski went on to work for Rock Tax Team. Rocci says he did not recruit any former employees prior to 2019.

## Discussion

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law." *Est. of Suskovich v. Anthem Health Plans Of Virginia, Inc.*, 553 F.3d 559, 563 (7th Cir. 2009) (internal quotation marks omitted). When courts consider cross-motions for summary judgment, the "ordinary standards" remain in effect. *Blow v. Bijora, Inc.*, 855 F.3d 793, 797 (7th Cir. 2017).

"It is axiomatic that the first step in the summary-judgment process is to ask whether the evidentiary record establishes a genuine issue of material fact for trial." *James v. Hale*, 959 F.3d 307, 310 (7th Cir. 2020). "A 'material fact' is one identified by the substantive law as affecting the outcome of the suit." *Hanover Ins. Co. v. N. Bldg. Co.*, 751 F.3d 788, 791 (7th Cir. 2014). A genuine dispute regarding a material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In considering a motion for summary judgment, a court must view the facts "in the light most favorable to the nonmoving party" but "only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007). "On summary judgment a

5

court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder." *Taylor v. City of Milford*, — F.4th —, 2021 WL 3673235, at *3 (7th Cir. Aug. 19, 2021) (internal quotation marks omitted).

Generally, the party seeking summary judgment bears the initial responsibility of proving there is no genuine issue of material fact, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986), and if it does so the nonmoving party "'must set forth specific facts showing that there is a genuine issue for trial.'" *Anderson*, 477 U.S. at 255. "Where the nonmovant bears the ultimate burden of persuasion on a particular issue . . . . the movant's initial burden may be discharged by showing—that is, point out to the district court—that there is an absence of evidence to support the nonmoving party's case. Upon such a showing, the nonmovant must then make a showing sufficient to establish the existence of an element essential to that party's case." *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013) (internal quotation marks and citation omitted).

To determine what is disputed, the Court must focus "not only on whether the parties profess to dispute a fact, but also on the evidence the parties offer to support their statements." *Thompson v. Village of Monee*, 110 F. Supp. 3d 826, 833 n.3 (N.D. Ill. 2015). "When we cite as undisputed a statement of fact that a party has attempted to dispute[,] that reflects our determination that the evidence does not show that the fact is in genuine dispute." *Id.* (internal quotation marks omitted).

If there are no genuine issues of material fact, the court then determines whether the moving party is entitled to judgment as a matter of law. *See Barnes*, 943 F.3d at 830. When a court determines that no material fact is in dispute and that the moving

party is entitled to judgment as a matter of law, it has in effect concluded that "no reasonable jury could find for the [non-moving] party based on the evidence in the record." *Martinsville Corral, Inc. v. Soc'y Ins.*, 910 F.3d 996, 998 (7th Cir. 2018) (internal quotation marks omitted).

## A.    Count 1 of Rocci's counterclaim

Up first is consideration of the parties' cross motions for summary judgment on Count 1 of Rocci's counterclaim.  Liberty says that it did not breach the terms of the area development agreement because Rocci failed to satisfy three conditions precedent for renewal.  Liberty points to several of Rocci's missteps to demonstrate this point. First, Rocci developed fewer Liberty franchises than mandated by the agreement's minimum requirements.  Second, under paragraph 9.10 of agreement, Rocci was supposed to address any communication required or permitted under the agreement— including his intent to renew—to Liberty's CEO.  Instead, Rocci addressed his letter to renew to "Liberty Tax Service" generally.  Finally, Liberty says, Rocci failed to execute a general release of all claims as required by the paragraph 8.2 of the agreement.

Rocci argues that he complied with the requirements for renewal.  First, he says that he provided written notice that served as actual notice, even if the agreement's technical requirements were not met.  Next, Rocci says that the minimum development requirements were not a condition precedent to renewal, and he points to other portions of the agreement to bolster this point.  Finally, Rocci says that he could not have signed a general release because Liberty did not follow certain FTC rules in preparation for his renewal.

Before turning to portions of the developer agreement that are at issue, the Court

recounts the standards for contract interpretation.  A court's primary objective when construing a contract "is to give effect to the intent of the parties, which is best shown by the language of the contract itself."  *Sterling Nat'l Bank v. Block*, 984 F.3d 1210, 1217 (7th Cir. 2021) (internal quotation marks omitted).  "Illinois uses in general a four corners rule in the interpretation of contracts, holding that if the language of a contract appears to admit of only one interpretation, the case is indeed over."  *Platinum Supplemental Ins., Inc. v. Guarantee Tr. Life Ins. Co.*, 989 F.3d 556, 563 (7th Cir. 2021) (alterations accepted and internal quotation marks omitted).  And mere disagreement "regarding the interpretation of a particular provision does not render that provision ambiguous."  *Liberty Mut. Fire Ins. Co. v. St. Paul Fire & Marine Ins. Co.*, 363 Ill. App. 3d 335, 341, 842 N.E.2d 170, 175–76 (2005).

Contracts with "substantial stakes" and negotiated by "commercially sophisticated parties" are interpreted "literally because such parties know how to say what they mean and have an incentive to draft their agreement carefully."  *Sterling Nat'l Bank*, 984 F.3d at 1217 (internal quotation marks omitted).  In reading a contract's provisions, courts must not "view a clause or provision in isolation" but instead must "construe the contract as a whole, viewing each provision in light of the other provisions."  *Westfield Ins. Co. v. Keeley Constr., Inc.*, 2020 IL App (1st) 191876, ¶ 21. That said, courts must also "recognize that drafters of contracts, like drafters of statutes, may intentionally err on the side of redundancy to capture the universe."  *Sterling Nat'l Bank*, 984 F.3d at 1218 (internal quotation marks omitted) (collecting cases).

Turning to the merits, paragraph 8.2 of the parties' agreement states:

Upon the completion of the Term of this Agreement, provided Area Developer is in compliance with the terms and conditions in this Agreement,

8

> Liberty will provide Area Developer with the right to enter into a new agreement with Liberty for the provision of services to Liberty similar to those in this Agreement. If Area Developer wishes to renew this Agreement, Area Developer must notify Liberty in writing at least 180 days before the expiration of this Agreement. There will be no fee for the renewal, but Area Developer must execute a general release of all claims it may have against Liberty. Area Developer may also renew future Area Developer Agreements, if Area Developer is in compliance with the terms and conditions in such agreements, meets other conditions therein for renewal, and renews by signing our then current Area Developer Agreement. The fees percentages described in paragraphs 3.2 and 3.3 above will not be reduced upon any renewal nor will the Territory be reduced, except as may be reduced due to failure to meet Minimum Requirements, as described in paragraph 4.1 above.

Dkt. no. 54–1 at ECF p. 9 of 20.

Rocci argues that the agreement did not permit Liberty to refuse renewal based on failure to meet minimum requirements. That's not right. In plain English, the renewal provision states that at the end of the term, Liberty would provide Rocci with the right to enter into a new agreement so long as Rocci was "in compliance with the terms and conditions" of the parties' agreement. *See id.* Said differently, compliance with the terms and conditions of the agreement *was* a condition precedent for renewal. Schedule B of the agreement—"Minimum Requirements"—included some of the agreement's terms and conditions. According to Schedule B, between May 2008 to April 30, 2017, Rocci was required to have "identified and secured" 20 franchises within his territory. *See* dkt. no. 54–1 at ECF pp. 17–18. Rocci has admitted that he failed to meet this requirement. Therefore, Liberty was permitted to refuse renewal.

Rocci also says that another portion of the agreement—paragraph 4.1— establishes that the minimum requirements could not be a basis for denying renewal. In relevant part, paragraph 4.1 states:

> If Area Developer does not meet the Minimum Requirement, then within

9

ninety (90) days after the end of the year in which the Minimum Requirement was not met, Liberty may notify Area Developer that it desires to delete from the Territory up to the number of Franchise Territories by which area Developer failed to meet the Minimum Requirement for that year. Liberty's notice will designate which of the Franchise Territories it desires to delete from the Territory, and Liberty shall have the sole discretion to determine which then unassigned (meaning unsold) Franchise Territories it chooses to delete. Those Franchise Territories will be deemed deleted from the Territory effective upon Liberty's notice, and Area Developer will thereafter not be entitled to any share of franchise fees and royalties paid with respect to franchisees appointed within those Franchise Territories ("Liberty Franchisees") and Liberty Franchisees will not be deemed Franchisees for the purposes of this Agreement. This deletion is Liberty's sole remedy for failure to meet Minimum Requirements.

Dkt. no. 54–1 at ECF p. 6 of 20.

According to Rocci, the minimum development requirements could not be a basis for denying renewal because the last sentence of paragraph 4.1 states that "deletion is Liberty's sole remedy for failure to meet" the minimum requirements, *see id.*, and paragraph 8.2 says in its last sentence that "upon any renewal . . . Territory [will not] be reduced, except as may be reduced due to failure to meet Minimum Requirements, as described in paragraph 4.1 above," *see id.* at ECF p. 9 of 20. According to Rocci, this language "expressly contemplates renewal even if Minimum Requirements have not been met." Rocci's Reply Br. at 7.

The problem with Rocci's preferred reading of the agreement is that it would require the Court to read out of paragraph 8.2 the clause stating that Liberty will provide the right to a new agreement "provided Area Developer is in compliance with the terms and conditions in this Agreement. "Provided" means "on condition that" or "with the understanding," *Provided*, Merriam-Webster, https://www.merriam webster.com/dictionary/provided (last visited Aug. 25, 2021). Paragraph 8.2 unequivocally states that "*provided* [Rocci] is in compliance with the terms and

10

conditions in this Agreement, Liberty will provide [Rocci] with the right to enter into a new agreement with Liberty for the provision of services to Liberty similar to those in this Agreement." *See* dkt. no. 54–1 at ECF p. 9 of 20 (emphasis added). In short, the plain meaning of paragraph 8.2 is that compliance with the agreement's terms and conditions is prerequisite for renewal.

The only reading of the paragraph 4.1 that does not constructively amend paragraph 8.2 (which would be improper) is the most obvious reading: paragraph 4.1 only explains Liberty's *in-term* remedies for Rocci's failure to meet the minimum requirements. By its own terms, paragraph 4.1 empowered Liberty—upon recognizing Rocci was failing to meet minimum requirements—to delete portions of his territory as described by the agreement. Liberty was permitted to exercise this remedy each year of the agreement. Nothing in paragraph 4.1 expressly or implicitly touches upon Liberty's decision to renew the agreement. And although paragraph 8.2 references 4.1, that reference is limited. The last sentence of paragraph 8.2 simply states that upon renewal, territory could not be altered "except as may be reduced due to failure to meet Minimum Requirements, as described in paragraph 4.1." Dkt. no. 54–1 at ECF p. 9 of 20. This sentence, by its plain terms, only restricted Liberty's ability to reduce Rocci's territory upon renewal—it does not imply or mandate that Liberty *had to renew* Rocci's agreement.

Rocci asserts that the interpretation the Court has adopted means that Liberty "could refuse to renew upon any failure to meet minimum requirements" and that power would "render superfluous" that last sentence of paragraph 8.2. *See* Rocci's Reply Br. at 8. The Court disagrees. As noted above, the last sentence of paragraph 8.2

references paragraph 4.1 because that term describes the agreement's minimum requirements. *See* dkt. no. 54–1 at ECF p. 9 of 20. That sentence does not expressly state or implicitly indicate that failure to meet the minimum requirements could not be a basis for denying renewal. What it amounts to instead, is a clarification that territory upon renewal is the same unless previously reduced under the terms of the agreement. And at worst for Liberty, the reference to paragraph 4.1 is arguably the sort of redundancy one sometimes expects in contracts. *See Sterling Nat'l Bank*, 984 F.3d at 1218.

In sum, the parties' agreement premises any right to renewal on Rocci's part on compliance with the agreement's terms and conditions. It is undisputed that Rocci failed to meet the minimum requirements set forth in Schedule B. This means that Liberty was entitled to refuse renewal. The Court therefore denies Rocci's motion for summary judgment as to count 1 of his counterclaim and grants summary judgment on count 1 in favor of Liberty. Given this conclusion, the Court need not consider the parties' alternative arguments regarding notice, the FTC Rule, or the requirement for a general release.

## B.    Counts 4–6 of Liberty's amended complaint

Next, the Court considers the parties' arguments regarding counts 4, 5, and 6 of Liberty's complaint. The Court discusses each of these claims separately.

### 1.    Count 4

Count 4 of the complaint alleges a violation of the Defend Trade Secrets Act (DTSA). The first step in proving a violation of the DTSA is identifying a trade secret with sufficient specificity to prove it exists. *LigTel Commc'ns, Inc. v. Baicells Techs.,*

*Inc.*, 455 F. Supp. 3d 792, 807 (N.D. Ind. 2020). After proving the existence of the trade secret, the party alleging the violation must then establish "misappropriation, that is, either the acquisition of a trade secret of another by improper means or the disclosure or use of a trade secret of another without express or implied consent." *Id.* (alterations accepted and internal quotation marks omitted).

Liberty identifies several trade secrets. It accuses Rocci of misappropriating confidential information about its methods of operation, service, techniques, customer information, and marketing information, among other things. Rocci does not argue in response to the motion that the items of confidential information cited by Liberty were not trade secrets. Instead, Rocci says even assuming the confidential information constituted trade secrets, he is entitled to summary judgment because Liberty has no evidence that he used the trade secrets outside of the scope of the franchise agreement. *See Modrowski*, 712 F.3d at 1168 ("Where the nonmovant bears the ultimate burden of persuasion on a particular issue . . . the movant's initial burden may be discharged by showing—that is, point out to the district court—that there is an absence of evidence to support the nonmoving party's case.") (citation and internal quotation marks omitted)

To establish misappropriation, Liberty points to what it calls circumstantial evidence. *See* Liberty Br. at ECF p. 5. "Courts have recognized that circumstantial evidence is acceptable, indeed even expected, in trade secret misappropriation cases." *Xavian Ins. Co. v. Boeing Cap. Corp.*, No. 18 C 6222, 2019 WL 4750105, at *5 (N.D. Ill. Sept. 30, 2019) (alterations accepted and internal quotation marks omitted). "In fact, because direct evidence of theft and use of trade secrets is often not available, courts

13

routinely allow a plaintiff to rely on circumstantial evidence to *prove* misappropriation by drawing inferences from perhaps ambiguous circumstantial evidence." *Id.* (alterations accepted and internal quotation marks omitted).  In Liberty's telling, its circumstantial evidence would permit a reasonable jury to find that during the period the Plainfield office was still operating as a Liberty franchise, Rocci and Rock Tax Team used Liberty's confidential information to file taxes outside the Liberty system.

Liberty's primary evidence comes in the form of deposition testimony from its corporate representative, Brian Ashcraft.  Ashcraft testified that he and others at Liberty realized "there was an issue with rejected returns" from the Plainfield office.  *See* dkt. no. 130–5 at ECF p. 3 of 9.  After looking at a publicly available Internal Revenue Service database, Ashcraft and others "identified an additional EFIN that David Rocci was using to file tax returns" out of the Plainfield office.  *Id.* at ECF pp. 3–4 of 9.  The EFIN "was associated" with Rocci.  *Id.* at ECF p. 4 of 9.  From this, he and others at Liberty concluded that Rocci had filed tax returns outside of Liberty's system in violation of the franchise agreements.  Ashcraft's deposition testimony references what is currently identified as Exhibit G, a summary document put together by Liberty based on a portion of the publicly available information from an IRS database.

Rocci argues that Exhibit G is inadmissible because it is hearsay and because Liberty failed to authenticate the document.  *See* Rocci Reply at 7.  These arguments are not persuasive.  Under Federal Rule of Civil Procedure 1006, a party "may use a summary, chart, or calculation to prove the content of voluminous writings . . . that cannot be conveniently examined in court."  Summaries of records are admissible if the underlying records are accurate and would be admissible as evidence.  *United States v.*

*Robinson*, 803 F. App'x 21, 24 (7th Cir. 2020). Here, the underlying records are from a publicly available IRS database and therefore highly likely to be admissible as a public record under Federal Rule of Civil Procedure 803(8). *See* Liberty Resp. Br. at 5 fn.2 (citing *External Customer Data Store (ECDS) Extracts*, Internal Revenue Service, https://www.irs.gov/privacy-disclosure/external-customer-data-store-ecds-extracts (last visited Aug. 25, 2021)). Rocci does not argue that either "the source of the information or other circumstances indicate a lack of trustworthiness" for the public records. *See* Fed. R. Evid. 803. And although Rocci points out that Ashcraft was "no expert on the document," neither Rule 803 nor Rule 1006 required him to be.

Rocci also asserts that Exhibit G does not support Ashcraft's testimony. According to Ashcraft, he was sure Rocci violated the agreement when he noticed an EFIN associated with Rocci in the IRS database. But Exhibit G, Rocci says, "does not show the EFIN number at issue, who actually filed any of the returns . . . or whose return was filed." Rocci Reply at 7. Even if all of that is true, there is no requirement that testimony be corroborated in order to defeat a motion for summary judgment. The Court's role at this stage is to "determine whether there is a genuine issue for trial," not to "weigh the evidence and determine the truth of the matter." *Anderson*, 477 U.S. at 249.

The other circumstantial evidence Liberty cites provides further support for inferring that Rocci misappropriated Liberty's confidential information. Regarding the customer list, Liberty accuses Rocci of using the customer list without express or implied consent, *see* Amd. Compl. ¶ 133, and argues that the failure to return the customer list provides "further circumstantial evidence" of misappropriation, Liberty's

Resp. Br. at 10.  Along with Ashcraft's testimony, Rocci's failure to return the customer list may be evidence that he misappropriated it.

Liberty also points out that Grabowski testified that Rocci tried to "train and pitch" her a new tax software—an alternative to Liberty's—with the hope that they could run a "hybrid" model and complete "tax returns with the new [software] and get away with not [paying] any royalties."  *See* Dkt. no. 125–3 at ECF p. 8 of 16.  Grabowski also testified that when she worked part-time during the 2018 tax season, she thought the alternative software was being used in the Plainfield office.  See *id.* at ECF p. 12 of 16.  She said that Rocci "had something [he] called System B," which she believed was the alternative software.  See *id.*  Grabowski was not allowed to use or approach a computer in the back, the computer on which "System B" was installed.  See *id.* at ECF p. 16 of 16.  Only a handful of employees could use this computer.  *See id.*

Grabowski's testimony is cited to suggest that Rocci filed returns outside of the Liberty system.  Grabowski admitted that she never filed tax returns using alternative software, never saw anyone else file a return with alternative software, and was not aware of any returns filed with alternative software.  See *id.*  Nevertheless, Grabowski's testimony is circumstantial evidence that a reasonable jury could find supports Liberty's accusation.  Grabowski's testimony supports that Rocci proposed a scheme, and a reasonable jury could infer that he followed through with the scheme as well.

Because Liberty has provided circumstantial evidence that Rocci misappropriated its trade secrets—evidence that would permit a reasonable jury to return a verdict in Liberty's favor on Count 4—the Court denies Rocci's motion for summary judgment on this claim.

16

2.      **Count 5**

Count 5 alleges common law unfair competition.  Rocci first argues that the claim

must be dismissed because Liberty has not made a claim for unfair competition under

the Illinois Uniform Deceptive Trade Practices Act (IUDTPA) or a claim for tortious

interference with prospective business advantage.  The Court is not persuaded.

Though it is generally true that the IUDTPA has codified the common law tort of unfair

competition, "certain causes of action for unfair competition may still be found outside

the statute."  *Dynamic Fluid Control (PTY) Ltd. v. Int'l Valve Mfg., LLC*, 790 F. Supp. 2d

732, 740 (N.D. Ill. 2011) (internal quotation marks omitted); *see* 815 Ill. Comp. Stat.

Ann. 510/2 ("This Section does not affect unfair trade practices otherwise actionable at

common law or under other statutes of this State.").  One of the causes of action that

exists outside the IUDTPA is misappropriation.  *Hycor Corp. v. Dontech, Inc.*, No. 84 C

3398, 1985 WL 3604, at *3 (N.D. Ill. Oct. 31, 1985) ("The Illinois courts recognize

certain acts of unfair competition not codified in the UDTPA.  For example, the Illinois

courts recognize the tort of misappropriation."); *see also Logan Graphic Prod., Inc. v.

Textus USA, Inc.*, No. 02 C 1823, 2002 WL 31507174, at *7 (N.D. Ill. Nov. 8, 2002);

*Integrated Genomics, Inc. v. Kyrpides*, No. 06 C 6706, 2008 WL 630605, at *13 (N.D. Ill.

Mar. 4, 2008).

Moreover, tortious interference is not the only basis for common law unfair

competition.  The "elements necessary to support a cause of action for unfair

competition are not well defined."  *Logan Graphic Prod.*, 2002 WL 31507174, at *7.

Some district courts have premised unfair competition claims on the elements of tortious

interference, but others have relied on the elements of misappropriation.  *Compare*

17

*BlueStar Mgmt. LLC v. The Annex Club, LLC*, No. 09 C 4540, 2010 WL 2802213, at *9
(N.D. Ill. July 12, 2010) (dismissing common law unfair competition claim because
plaintiff failed to state a claim for tortious interference with prospective economic
advantage and had already stated an identical claim under the IUDTPA), *with Logan
Graphic Prod.,* 2002 WL 31507174, at *7 (citing cases supporting the use of a
"misappropriation standard" and using that standard to analyze the viability of the
plaintiff's unfair competition claim).

In two short sentences in his reply brief, Rocci contends that Liberty, like the
plaintiff in *Logan Graphic Products*, has failed to state a viable claim that he
misappropriated trademarks or trade secrets through a fiduciary or confidential
relationship or through fraud or deception. Rocci Reply at 14. This argument was likely
forfeited due to Rocci's failure to make it in his opening brief. That aside, Liberty *has*
pled, *see* Amd. Compl. ¶¶ 140-49, that the parties had a "special relationship" through
which Rocci would have had access to the trade secrets and trademarks that Rocci is
accused of misappropriating. *See Logan Graphic Prod.,* 2002 WL 31507174, at *7; *see
also Stephen & Hayes Constr., Inc. v. Meadowbrook Homes, Inc.*, 988 F. Supp. 1194,
1200 (N.D. Ill. 1998) (citing *Wilson v. Electro Marine Sys., Inc.*, 915 F.2d 1110, 1119
(7th Cir. 1990) ("Generally speaking, unfair competition requires the misappropriation of
the labors and expenditures of another, i.e., one party reaps where another has sown.").
Rocci's argument on this point is therefore unavailing.

Rocci also cites two Illinois state court cases in support of his argument that, to
avoid dismissal of this count, Liberty must plead either a claim for violation of the
IUDTPA or for tortious interference with prospective business relations. Neither of

18

those cases wins the day.  In *Custom Business Systems, Inc. v. Boise Cascade Corp.*, 68 Ill. App. 3d 50, 385 N.E.2d 942 (1979), the court affirmed the dismissal of the plaintiff's unfair competition claim because the plaintiff did not "point out any aspect of th[e] case which constitute[d] a separate common law tort," in addition to his allegations regarding the IUDTPA.  *Id.* at 53, 385 N.E.2d at 944.  The court did not "dispute that there may be a cause of action under certain aspects of the common law which are not covered" by the IUDTPA.  *Id.*  Instead, because the court was "not inclined to search out the ramifications of a common law action, which might establish grounds for relief in addition to the elements of unfair competition recognized under the Act," it only considered the sufficiency of the plaintiff's complaint on the basis of the IUDTPA.  *Id.* Liberty has not asserted an additional claim under IUDTPA, so *Custom Business Systems* is distinguishable.

In *The Film & Tape Works, Inc. v. Junetwenty Films, Inc.*, 368 Ill. App. 3d 462, 856 N.E.2d 612 (2006), the plaintiff argued that its unfair competition claim was "identical to the tort of interference with prospective economic advantage."  *Id.* at 473, 856 N.E.2d at 622.  The plaintiff even premised both claims on the same factual allegations.  *Id.*  Because the court had already found that there was "no evidence" to support the plaintiff's allegations of tortious interference, it "dispose[d] of the unfair competition claim as well without necessitating any further analysis."  *Id.*  Because the plaintiff conceded the two claims were identical, the brief discussion in this case of common law unfair competition adds little to the analysis here.

Lastly, Rocci makes an alternative argument to dismissal.  He asks the Court to grant partial summary judgment in his favor on a portion of Count 5 in which Liberty

alleges he unlawfully used its trade secrets. *See* Amd. Compl. ¶ 143 ("Defendants improperly used, and will continue to use, Liberty's trade secrets and Confidential Information in furtherance of the operation of a tax preparation business that competes directly with Liberty."). To survive partial summary judgment, Liberty cites the same evidence it used in connection with Count 4, *see* Liberty Resp. Br. at 12–13, which the Court has already concluded are circumstantial evidence that Rocci misappropriated Liberty's trade secrets. *See supra* at 12–16. Thus, for the same reasons as discussed above, the Court concludes that partial summary judgment in favor of Rocci would be inappropriate.[1]

For the reasons discussed, the Court denies Rocci's motion for summary judgment on Count 5.

### 3.    Count 6

In Count 6, Liberty alleges that Rocci breached the covenants not to compete. Because this count is premised on the same allegations and evidence proffered for Count 4, *see* Liberty Resp. Br. at 13–15; Rocci Reply at 14–15, the Court denies Rocci's motion for summary judgment on Count 6. There is sufficient evidence in the record to conclude that Rocci filed tax returns outside the Liberty system and in violation of the parties' agreements. Thus, a jury could properly return a verdict in Liberty's favor. *See Modrowski*, 712 F.3d at 1168–69.

---

[1] Rocci also asks for summary judgment on a portion of Count 5 in which Liberty alleges he used one of its registered trademarks (the Lady Liberty image) after the Plainfield office became Rock Tax Team. Rocci made this argument for the first time in his reply brief, so the argument is forfeited. *See O'Neal v. Reilly*, 961 F.3d 973, 974 (7th Cir. 2020) ("[W]e have repeatedly recognized that district courts are entitled to treat an argument raised for the first time in a reply brief as waived.").

**Conclusion**

For the reasons stated above, the Court grants Liberty's motion for summary judgment on Count 1 of the amended counterclaim [dkt. no. 118] and denies Rocci's cross-motion for summary judgment on Count 1 of the amended counterclaim [dkt. no. 123] is denied. Rocci's motion for summary judgment on Counts 4, 5, and 6 of Liberty's amended complaint [dkt. no. 124] is denied. This case is set for a telephone status hearing on September 7, 2021 at 8:55 a.m. to set a trial date and discuss the possibility of settlement, using call-in number 888-684-8852, access code 746-1053. Counsel should wait for the case to be called before announcing themselves.

_____
MATTHEW F. KENNELLY
United States District Judge

Date:  August 30, 2021